**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| THE GILLETTE COMPANY LLC,<br><br>                    Plaintiff,<br><br>      v.<br><br>THE PARTNERSHIPS and<br>UNINCORPORATED ASSOCIATIONS<br>IDENTIFIED ON SCHEDULE "A,"<br><br>                    Defendants. | Case No. 25-cv-05251 |

**COMPLAINT**

Plaintiff, The Gillette Company LLC ("Plaintiff"), by and through its undersigned counsel, TME Law, P.C., hereby brings the present action against the Partnerships and Unincorporated Associations identified in Schedule A attached hereto (collectively, "Defendants"), and hereby alleges as follows:

**JURISDICTION AND VENUE**

1.      This Court, the United States District Court for the Northern District of Illinois, Eastern Division (hereinafter, the "Judicial District"), has original subject matter jurisdiction over Plaintiff's claims pursuant to the provisions of the Lanham Act, 15 U.S.C. § 1051, *et seq*., 28 U.S.C. § 1338(a)-(b), and 28 U.S.C. § 1331. This Court also has jurisdiction over Plaintiff's claims that arise under the laws of the State of Illinois pursuant to 28 U.S.C. § 1367(a) because the state law claims are so related to the federal claims that they form part of the same case or controversy and derive from a common nucleus of operative facts.

2.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391, and this Court may

1

properly exercise personal jurisdiction over Defendants because Defendants structure their business activities so as to target consumers in the United States, including Illinois, through at least the fully interactive e-commerce stores operating under the aliases identified on Schedule A attached hereto (the "Seller Aliases").  Specifically, Defendants have targeted sales to Illinois residents by setting up and operating e-commerce stores that target United States consumers, offer shipping to the United States, including Illinois, accept payment in U.S. dollars and, on information and belief, sell products using infringing and counterfeit versions of Plaintiff's federally registered trademarks (collectively, the "Unauthorized Products"), including razors, razor blades, razor handles, and other personal care/grooming products to residents of Illinois.  Each of the Defendants is committing tortious acts in Illinois, engaging in interstate commerce, and has wrongfully caused Plaintiff substantial injury in the State of Illinois.

## INTRODUCTION

3.      Plaintiff filed this case to prevent e-commerce store operators who trade upon Plaintiff's reputation and goodwill from further selling and/or offering for sale Unauthorized Products. Defendants create e-commerce stores under one or more Seller Aliases and then advertise, offer for sale, and/or sell Unauthorized Products to unknowing consumers. E-commerce stores operating under the Seller Aliases share identifiers, such as design elements and similarities of the Unauthorized Products offered for sale, establishing that a logical relationship exists between them, and that Defendants' counterfeiting operations arises out of the same transaction, occurrence, or series of transactions or occurrences. Defendants take advantage of a set of circumstances, including the anonymity and mass reach afforded by the Internet and the cover afforded by international borders, to violate Plaintiff's intellectual property rights with impunity.  Defendants attempt to avoid liability by operating under one or more Seller Aliases to conceal their identities, locations, and the full scope and interworking of their counterfeiting operation.   Plaintiff is forced to file this action to combat

Defendants' counterfeiting of its registered trademarks, as well as to protect consumers from purchasing Unauthorized Products over the Internet. Plaintiff has been, and continues to be, irreparably damaged through consumer confusion and dilution of its valuable trademarks because of Defendants' actions and therefore seeks injunctive and monetary relief.

## THE PLAINTIFF

4.      Plaintiff, The Gillette Company LLC, is a limited liability company organized and existing under the laws of Delaware with its principal place of business in the state of Massachusetts. Plaintiff is the exclusive registered owner of the trademarks asserted herein and is therefore the proper plaintiff to bring this action.

5.      Gillette is in the business of, among other things, developing, designing, advertising, and marketing personal care/grooming products for men and women. These personal care/grooming products include a variety of shaving products. Gillette, as part of the Procter & Gamble family, is the global market leader in razors, shaving, and razor blade and shaving products.

6.      Gillette offers proprietary razors, razor blade cartridges, shaving blade units, razor blade dispensers, and refill razor blades under the Gillette® and Fusion® trademarks, and other trademarks (collectively, "Genuine Gillette Products").

7.      Genuine Gillette Products have become enormously popular in the decades they have been sold, driven by Plaintiff's arduous quality standards and innovative designs. The Gillette brand resonates with consumers, and Genuine Gillette Products are among the most recognizable in the United States. Genuine Gillette Products are distributed and sold to consumers through retailers throughout the United States, including through authorized retailers in Illinois such as Target, Wal-Mart, CVS, and Walgreens, and through the official www.gillette.com website, among many others.

8.      Long before Defendants' acts described herein, Plaintiff launched its Gillette lines

3

of shaving products bearing Plaintiff's famous logos and registered trademarks. For generations, the Gillette brand has been a world leader in the field of shaving.

9. The trademarks related to Plaintiff's Gillette brand ("Plaintiff's Trademarks") have been in use for many years and razor and razor blade products have been continuously sold under Plaintiff's Trademarks. As a result of this long-standing use, strong common law trademark rights have amassed in Plaintiff's Trademarks. The consistent use of the marks has also built substantial goodwill in and to Plaintiff's Trademarks. Some of Plaintiff's Trademarks are famous marks and all are valuable assets of Plaintiff. Genuine Gillette Products typically include at least one of Plaintiff's Trademarks.

10. Plaintiff's Trademarks are registered with the United States Patent and Trademark Office and are included below.

| Registration Number | Trademark | Registration Date | Goods and Services |
|---|---|---|---|
| 5,471,122 | AQUA-GRIP | May 15, 2018 | For: Razors in class 008. |
| 923,773 | ATRA | Nov. 16, 1971 | For: RAZORS AND RAZOR BLADES in class 008. |
| 1,491,967 | ATRA PLUS | Jun. 14, 1988 | For: RAZORS AND RAZOR BLADES in class 008. |
| 6,616,753 | BALDLY | Jan. 11, 2022 | For: Shaving preparations in class 003. For: Razors and razor blades in class 008. |
| 3,337,911 | COMFORT HOLD | Nov. 20, 2007 | For: Handles sold as a component of disposable razors in class 008. |
| 5,201,416 | COMFORTGLIDE | May 09, 2017 | For: Razors and razor blades; dispensers, cassettes, holders, and cartridges, all specifically designed for and containing razor blades; parts and fittings for all the aforesaid goods in class 008. |

| 1,865,174 | CUSTOMPLUS | Nov. 29, 1994 | For: razors in class 008. |
|---|---|---|---|
| 833,292 | DAISY | Aug. 08, 1967 | For: RAZORS in class 008. |
| 4,585,172 | DIVINE SENSITIVE | Aug. 12, 2014 | For: razors and razor blades; dispensers, cassettes, holders, and cartridges, all specifically designed for and containing razor blades; parts and fittings for all the aforesaid goods in class 008. |
| 3,445,786 | EMBRACE | Jun. 10, 2008 | For: Razors and razor blades; dispensers, cassettes, holders and cartridges all containing blades; and structural parts therefor in class 008. |
| 4,637,722 | FLEXBALL | Nov. 11, 2014 | For: parts and fittings for razors, namely, a mechanism which allows a razor head to pivot on two axes and its associated housing sold as an integrated component part of a razor in class 008. |
| 5,735,582 | FLEXDISC | Apr. 23, 2019 | For: Razors and razor blades; dispensers, cassettes, holders, and cartridges, all specifically designed for and containing razor blades in class 008. |
| 4,770,286 | FLEXIBALL | Jul. 07, 2015 | For: razors and razor blades; dispensers, cassettes, holders, and cartridges, all specifically designed for and containing razor blades; parts and fittings for all the aforesaid goods in class 008. |
| 3,099,224 | FUSION | May 30, 2006 | For: Razors and razor blades; dispensers, cassettes, holders and cartridges all containing blades; and structural parts therefor in class 008. |
| 5,392,030 | FUSION5 | Jan. 30, 2018 | For: Razors and razor blades; dispensers, cassettes, holders, and cartridges, all specifically designed |

| | | | |
|---|---|---|---|
| | | | for and containing razor blades in class 008. |
| 767,865 | GILLETTE | Apr. 07, 1964 | For: Safety Razors and Safety Razor Blades in class 008. |
| 6,449,475 | GILLETTE BLACK | Aug. 10, 2021 | For: Razors and razor blades; dispensers, cassettes, holders, and cartridges, specially adapted for and containing razor blades in class 008. |
| 4,526,989 | GILLETTE BODY | May 06, 2014 | For: Razors and razor blades; dispensers, cassettes, holders, and cartridges, all specifically designed for and containing razor blades; parts and fittings for all the aforesaid goods in class 008. |
| 6,951,611 | GILLETTE INTIMATE | Jan. 10, 2023 | For: Shaving preparations; after shave preparations; non-medicated anti-chafe skin care preparations in the nature of balms in stick form for use on skin; non medicated skin care preparations in class 003.<br><br>For: Razors and razors blades; hair trimmers in class 008. |
| 6,591,880 | GILLETTE SLATE | Dec. 14, 2021 | For: Razors and razor blades in class 008. |
| 5,927,803 | GILLETTELABS | Dec. 03, 2019 | For: Razors and razor blades; dispensers, cassettes, holders, and cartridges, all specifically designed for and containing razor blades in class 008. |
| 1,039,567 | GOOD NEWS | May 18, 1976 | For: RAZORS in class 008. |
| 2,390,089 | INDICATOR | Sep. 26, 2000 | For: SHAVING AID IN THE FORM OF A PLASTIC PAD WHICH IS A COMPONENT OF RAZOR BLADE CARTRIDGES in class 008. |

| | | | |
|---|---|---|---|
| 5,898,765 | JOY | Oct. 29, 2019 | For: Razors and razor blades; dispensers, cassettes, holders, and cartridges, all specifically designed for and containing razor blades in class 008. |
| 6,103,098 | KING C. GILLETTE | Jul. 14, 2020 | For: Shaving preparations, namely, shaving creams, shaving gels, shaving oils, shaving lotions, and shaving foams; after shave splashes, lotions and balms; pre-shave facial washes and scrubs; skin care preparations, namely, skin moisturizers; non-medicated skin care preparations; body sprays; cologne; anti-perspirants and deodorants; body wash in class 003.<br><br>For: Razors and razor blades; dispensers, cassettes, holders, and cartridges, all specifically designed for and containing razor blades in class 008. |
| 1,796,785 | LUBRASTRIP | Oct. 05, 1993 | For: shaving aid in the form of a plastic pad which is a component of razors and razor blades in class 008. |
| 5,820,369 | MACH3 | Jul. 30, 2019 | For: Razors and razor blades; dispensers, cassettes, holders, and cartridges, all specifically designed for and containing razor blades in class 008. |
| 7,038,752 | MIAMI SUNRISE | Apr. 25, 2023 | For: Razors and razor blades in class 008. |
| 7,038,753 | MIAMI SUNSET | Apr. 25, 2023 | For: Razors and razor blades in class 008. |
| 1,893,538 | MOISTURERICH | Mat 09, 1995 | For: shaving aid in the form of a plastic pad which is a component of razors and/or razor blades in class 008. |

| 4,906,113 | MORRIS PARK COLLECTION | Feb. 23, 2016 | For: Razors and razor blades; dispensers, cassettes, holders, and cartridges, all specifically designed for and containing razor blades; parts and fittings for all the aforesaid goods in class 008. |
|---|---|---|---|
| 7,339,963 | PERMA-SHARP | Mar. 26, 2024 | For: Razors and razor blades in class 008. |
| 6,357,753 | PLANET KIND | May 18, 2021 | For: Shaving preparations, namely, shaving creams, shaving gels, shaving lotions, and shaving foams; after shave splashes, lotions and balms; pre-shave facial washes and scrubs; skin care preparations, namely, skin moisturizers; non-medicated skin care preparations; body sprays; cologne; anti-perspirants and deodorants for personal use; body wash; non-medicated soaps in class 003.<br><br>For: Razors and razor blades; dispensers, cassettes, holders, and cartridges, specially adapted for and containing razor blades in class 008. |
| 3,372,715 | POWERGLIDE | Jan. 22, 2008 | For: Razors and razor blades; dispensers, cassettes, holders, and cartridges, all containing blades; and structural parts therefor in class 008. |
| 3,828,789 | PROGLIDE | Aug. 03, 2010 | For: Razors and razor blades; dispensers, cassettes, holders, and cartridges, all containing blades; and structural parts therefor in class 008. |
| 4,928,111 | PROSHIELD | Mar. 29, 2016 | For: razors and razor blades; dispensers, cassettes, holders, and cartridges, all specifically designed for and containing razor blades; |

| | | | parts and fittings for all the aforesaid goods in class 008. |
|---|---|---|---|
| 1,173,952 | SENSOR | Oct. 20, 1981 | For: Razors and Razor Blades in class 008. |
| 1,887,758 | SENSOR EXCEL | Apr. 04, 1995 | For: razors and razor blades in class 008. |
| 5,228,681 | SENSOR SIMPLE 3 | Jun. 20, 2017 | For: Razors and razor blades; dispensers, cassettes, holders, and cartridges, all specifically designed for and containing razor blades; parts and fittings for all the aforesaid goods in class 008. |
| 6,970,053 | SIMPLEPASS | Jan. 31, 2023 | For: Razors and razor blades in class 008. |
| 3,791,137 | SIMPLY VENUS | May 18, 2010 | For: Razors and razor blades; dispensers, cassettes, holders and cartridges all containing razor blades; and structural parts therefor in class 008. |
| 4,544,332 | SNAP | Jun. 03, 2014 | For: razors and razor blades; dispensers, cassettes, holders, and cartridges, all specifically designed for and containing razor blades; parts and fittings for all the aforesaid goods in class 008. |
| 5,256,516 | SWIRL | Aug. 01, 2017 | For: razors and razor blades; dispensers, cassettes, holders, and cartridges, all specifically designed for and containing razor blades; parts and fittings for all the aforesaid goods in class 008. |
| 3,929,293 | THE ART OF SHAVING | Mar. 08, 2011 | For: shaving preparations, namely, shaving creams, shaving gels, shaving lotions, and shaving foams; after shave lotions and balms; pre-shave facial washes and moisturizers; non-medicated skin care preparations; body sprays; cologne in class 003. |

|  |  |  | For: razors and razor blades; dispensers, cassettes, holders, and cartridges, all containing blades; and structural parts therefor in class 008. <br><br> For: shaving accessories, namely, shaving brushes and shaving stands for razors and shaving brushes in class 021. |
|---|---|---|---|
| 2,552,780 | THE BEST A MAN CAN GET | Mar. 26, 2002 | For: RAZORS, RAZOR BLADES, AND STRUCTURAL AND REPLACEMENT PARTS THEREOF in class 008. |
| 960,814 | TRAC II | Jun. 12, 1973 | For: RAZORS AND RAZOR BLADES in class 008. |
| 5,638,398 | TREASURES | Dec. 25, 2018 | For: Razors and razor blades; dispensers, cassettes, holders, and cartridges, all specifically designed for and containing razor blades; parts and fittings for all the aforesaid goods in 008. |
| 5,525,840 | TREO | Jul. 24, 2018 | For: Shaving preparations, namely, shaving gels, in class 003. <br><br> For: Razors and razor blades; dispensers, cassettes, holders, and cartridges, all specifically designed for and containing razor blades in class 008. |
| 3,667,564 | TROPICAL | Aug. 11, 2009 | For: Disposable razors in class 008. |
| 2,724,786 | TURBO | Jun. 10, 2003 | For: RAZORS, RAZOR BLADES AND PARTS THEREOF in class 008. |
| 3,475,157 | ULTRAGRIP | Jul. 29, 2008 | For: Handles sold as a component of disposable razors in class 008. |

| 2,488,308 | VENUS | Sep. 11, 2001 | For: RAZOR AND RAZOR BLADES; DISPENSERS; CASSETTES; HOLDERS AND CARTRIDGES ALL CONTAINING BLADES; AND STRUCTURAL PARTS THEREFOR in class 008. |
|---|---|---|---|
| 3,349,843 | VENUS BREEZE | Dec. 04, 2007 | For: Razors and razor blades; dispensers, cassettes, holders and cartridges all containing blades; and structural parts therefor in class 008. |
| 2,892,008 | VENUS DIVINE | Oct. 05, 2004 | For: Razors and razor blades; dispensers, cassettes, holders and cartridges, all containing blades; and structural parts therefor in class 008. |
| 4,018,169 | VENUS OCEANA | Aug. 30, 2011 | For: disposable razors in class 008. |
| 3,163,747 | VENUS VIBRANCE | Oct. 24, 2006 | For: Razors and razor blades; dispensers, cassettes, holders and cartridges all containing blades; and structural parts therefor in class 008. |
| 5,351,380 |  | Dec. 05, 2017 | For: Razors and razor blades; dispensers, cassettes, holders, and cartridges, all specifically designed for and containing razor blades; parts and fittings for all the aforesaid goods in class 008. |
| 5,392,514 | | Jan. 30, 2018 | For: Shaving preparations, namely, shaving creams, shaving gels, shaving lotions; after shave balms; pre-shave facial; all of the aforementioned goods are non- |

| | | | |
|---|---|---|---|
| |  | | medicated for class 003.<br><br>For: Razors and razor blades in class 008.<br><br>For: Shaving accessories, namely, shaving brushes and shaving stands for razors and shaving brushes in class 021. |
| 3,917,679 |  | Feb. 08, 2011 | For: Shaving preparations, namely, shaving creams, shaving gels, shaving lotions, and shaving foams; after shave lotions and balms; pre-shave facial washes and moisturizers; non-medicated skin care preparations; body sprays; cologne; all of the aforementioned goods are non-medicated in class 003.<br><br>For: Razors and razor blades; dispensers, cassettes, holders, and cartridges, all containing razor blades; and structural parts therefor in class 008.<br><br>For: Shaving accessories, namely, shaving brushes and shaving stands for razors and shaving brushes in class 021. |
| | | | |

| | | | |
|---|---|---|---|
| 6,616,752 | baldly | Jan. 11, 2022 | For: Shaving preparations in class 003.<br><br>For: Razors and razor blades in class 008. |
| 3,549,130 | Comfort Blades | Dec. 23, 2008 | For: Razors, razor blades and parts and components for such goods in class 008. |
| 3,243,424 | Daisy | May 22, 2007 | For: Disposable razors in class 008. |
| | | | |

| | | | |
|---|---|---|---|
| 3,962,440 | | May 17, 2011 | For: Razors and razor blades; dispensers, cassettes, holders, and cartridges, all containing razor blades; and structural parts therefor in class 008. |
| 5,749,644 | | May 14, 2019 | For: Razors and razor blades; dispensers, cassettes, holders, and cartridges, all specifically designed for and containing razor blades in class 008. |
| 6,449,476 | | Aug. 10, 2021 | For: Razors and razor blades; dispensers, cassettes, holders, and cartridges, specially adapted for and containing razor blades in class 008. |
| 4,957,388 | | May 10, 2016 | For: razors and razor blades; dispensers, cassettes, holders, and cartridges, all specifically designed for and containing razor blades; parts and fittings for all the aforesaid goods in class 008. |
| 5,504,463 | | Jun. 26, 2018 | For: Razors and cartridges, all specifically designed for and containing razor blades in class 008. |
| | | | For: Razors and razor blades; dispensers, cassettes, holders, and |

14

| | | | |
|---|---|---|---|
| 5,875,546 | **Gillette** Labs | Oct. 01, 2019 | cartridges, all specifically designed for and containing razor blades in class 008. |
| 5,898,764 | **joy** | Oct. 29, 2019 | For: Razors and razor blades; dispensers, cassettes, holders, and cartridges, all specifically designed for and containing razor blades in class 008. |
| 6,103,097 |  | Jul. 14, 2020 | For: Shaving preparations, namely, shaving creams, shaving gels, shaving oils, shaving lotions, and shaving foams; after shave splashes, lotions and balms; pre-shave facial washes and scrubs; skin care preparations, namely, skin moisturizers; non-medicated skin care preparations; body sprays; cologne; anti-perspirants and deodorants; body wash in class 003.<br><br>For: Razors and razor blades; dispensers, cassettes, holders, and cartridges, all specifically designed for and containing razor blades in class 008. |
| 6,091,993 | King·C·Gillette | Jun. 30, 2020 | For: Shaving preparations, namely, shaving creams, shaving gels, shaving oils, shaving lotions, and shaving foams; after shave splashes, lotions and balms; pre-shave facial washes and scrubs; skin care preparations, namely, skin moisturizers; non-medicated skin care preparations; body sprays; cologne; anti-perspirants and deodorants; body wash in class 003.<br><br>For: Razors and razor blades; dispensers, cassettes, holders, and |

| | | | |
|---|---|---|---|
| | | | cartridges, all specifically designed for and containing razor blades in class 008. |
| 2,300,839 | MACH3 | Dec. 14, 1999 | For: RAZORS, RAZOR BLADES AND PARTS THEREOF in class 008. |
| 2,599,189 | MACH3 Turbo | Jul. 23, 2002 | For: NON-ELECTRIC RAZORS, RAZOR BLADES AND PARTS THEREOF in class 008. |
| 5,525,864 | TREO | Jul. 24, 2018 | For: Shaving preparations, namely, shaving gels in class 003.<br><br>For: Razors and razor blades; dispensers, cassettes, holders, and cartridges, all specifically designed for and containing razor blades in class 008. |
| 6,895,133 | | Nov. 08, 2022 | For: Shaving preparations in class 003.<br><br>For: Razors and razor blades in class 008. |
| 3,181,554 | V3 | Dec. 05, 2006 | For: Razors and razor blades in class 008. |

| | | | |
|---|---|---|---|
| 5,582,166 |  | Oct. 09, 2018 | For: Razors and razor blades; dispensers, cassettes, holders, and cartridges, all specifically designed for and containing razor blades in class 008. |
| 5,065,880 |  | Oct. 18, 2016 | For: razors and razor blades; dispensers, cassettes, holders, and cartridges, all specifically designed for and containing razor blades; parts and fittings for all the aforesaid goods in class 008. |
| 5,538,052 |  | Aug. 14, 2018 | For: razor blade cartridges in class 008. |
| 4,288,162 |  | Feb. 12, 2013 | For: razors and razor blades; dispensers, cassettes, holders, and cartridges, all specifically designed for and containing razor blades; parts and fittings for all the aforesaid goods in class 008. |
| | | | |

| | | | |
|---|---|---|---|
| 4,157,865 |  | Jun. 12, 2012 | For: razors and razor blades; dispensers, cassettes, holders, and cartridges, all containing razor blades; and structural parts therefor in class 008. |

11.     The U.S. registrations for Plaintiff's Trademarks are valid, subsisting, in full force and effect, and some are incontestable pursuant to 15 U.S.C. § 1065.  The registrations for Plaintiff's Trademarks constitute *prima facie* evidence of their validity and of Plaintiff's exclusive right to use Plaintiff's Trademarks pursuant to 15 U.S.C. § 1057(b). Plaintiff's Trademarks have been used exclusively and continuously by Plaintiff for many years and have never been abandoned. True and correct copies of the United States Registration certificates for Plaintiff's Trademarks are included in **Exhibit 1** attached hereto.

12.     Plaintiff's Trademarks are exclusive to Plaintiff and are displayed extensively on Genuine Gillette Products and in marketing and promotional materials. Plaintiff's Trademarks have been the subject of substantial and continuous marketing and promotion at great expense. In fact, significant resources are spent annually in advertising, promoting and marketing featuring Plaintiff's Trademarks. These promotional efforts include — by way of example, but not limitation — substantial print media, websites, social media sites, and point of sale materials. Because of these and other factors, many of Plaintiff's Trademarks have become famous throughout the United States.

13.     Plaintiff's Trademarks are distinctive when applied to Genuine Gillette Products, signifying to the purchaser that the products come from Plaintiff and are manufactured to Plaintiff's quality standards. Genuine Gillette Products are manufactured to the highest quality standards.

14.     Some of Plaintiff's Trademarks qualify as famous marks, as that term is used in 15 U.S.C § 1125(c)(1), and have been continuously used and never abandoned. The innovative marketing and product designs of the Genuine Gillette Products have enabled the Gillette brand to achieve widespread recognition and fame and have made Plaintiff's Trademarks some of the most well-known marks in the personal care/grooming industry. The widespread fame, outstanding reputation, and significant goodwill associated with the Gillette brand have made the Plaintiff's Trademarks valuable assets to Plaintiff.

15.     Genuine Gillette Products have also been extensively promoted on the www.gillette.com website. Sales of Genuine Gillette Products are significant, and consumers can purchase Genuine Gillette Products on this website. The website features proprietary content, images and designs exclusive to Plaintiff's brand, and trademarks.

16.     Genuine Gillette Products and Plaintiff's Trademarks have received significant unsolicited media coverage for many years, including in national publications as well as in numerous national television programs, online publications and websites.

17.     Sales of Genuine Gillette Products have, over the years, well exceeded one billion dollars. Since the initial launch of Genuine Gillette Products, Plaintiff's Trademarks have been the subject of substantial and continuous marketing and promotion. Plaintiff's Trademarks are consistently marketed and promoted in the industry and to consumers through traditional print media, television and radio commercials, billboard advertising, websites, social media platforms, product packaging and point of sale materials.

18.     Substantial time, money, and other resources have been spent in developing, advertising, and otherwise promoting Plaintiff's Trademarks. In fact, millions of dollars have been spent in advertising, promoting and marketing featuring Plaintiff's Trademarks. Gillette has established exclusive manufacturing and distribution networks for important and legitimate business reasons: protecting the validity of its intellectual property, including its trademarks rights, maintaining assurance of quality control, and avoiding product liability claims. Genuine Gillette Products have also been the subject of extensive unsolicited publicity resulting from their high-quality, innovative designs. As a result, products bearing Plaintiff's Trademarks are widely recognized and exclusively associated by consumers, the public, and the industry as being high-quality products sourced from Plaintiff. Genuine Gillette Products have become among the most popular of their kind in the U.S.

19.     Plaintiff's Trademarks have achieved tremendous fame and recognition which has

only added to the inherent distinctiveness of the marks. Genuine Gillette Products are consistently ranked among the best, highest quality razors. Indeed, Gillette is one of the United States' most popular razor brands. As such, the goodwill associated with Plaintiff's Trademarks is of incalculable and inestimable value to Plaintiff.

## THE DEFENDANTS

20.     Defendants are unknown individuals and business entities who own and/or operate one or more of the e-commerce stores under the Seller Aliases identified on Schedule A and/or other seller aliases not yet known to Plaintiff. On information and belief, Defendants reside and/or operate in foreign jurisdictions and redistribute products from the same or similar sources in those locations. Defendants have the capacity to be sued pursuant to Federal Rules of Civil Procedure 17(b).

21.     On information and belief, Defendants, either individually or jointly, operate one or more e-commerce stores under the Seller Aliases listed in Schedule A attached hereto. Upon information and belief, Defendants are an interrelated group of counterfeiters working to knowingly and willfully manufacture, import, distribute, offer for sale, and sell products using unauthorized counterfeit versions of Plaintiff's Trademarks in the same transaction, occurrence, or series of transactions or occurrences. Tactics used by Defendants to conceal their identities and the full scope of their operation make it virtually impossible for Plaintiff to learn Defendants' true identities and the exact interworking of their network. In the event that Defendants provide additional credible information regarding their identities, Plaintiff will take appropriate steps to amend its Complaint.

22.     Because the Defendants are selling counterfeit products that have sharp edges, the Defendants' counterfeiting activity has severe consequences.  A counterfeit Gillette razor can cause significant product failure and harm to the user. Indeed, purchasers of Unauthorized Products have complained of suffering injuries as a result of using Unauthorized products.

## THE DEFENDANTS' UNLAWFUL CONDUCT

23.    The success of the Gillette brand has resulted in its significant counterfeiting. Consequently, Plaintiff has a worldwide brand protection program and regularly investigates suspicious online marketplace listings identified in proactive Internet sweeps and reported by consumers. Plaintiff has identified numerous many fully interactive e-commerce stores offering Unauthorized Products on online marketplace platforms like Alibaba Group Holding Ltd. ("Alibaba"), AliExpress.com ("AliExpress"), Amazon.com, Inc. ("Amazon"), DHGate.com ("DHGate"), eBay, Inc. ("eBay"), Fruugo.com Limited ("Fruugo"),  Context Logic, Inc. d/b/a Wish.com ("Wish"), and Walmart, Inc. ("Walmart"), including the e-commerce stores operating under the Seller Aliases. The Defendants, through the Seller Aliases, target consumers in this Judicial District and throughout the United States. Despite Plaintiff's enforcement efforts, Defendants have persisted in creating the Seller Aliases.

24.    The combined traffic to 48 websites selling counterfeit goods was more than 240,000 visits per day on average, or more than 87 million visits per year. *See* **Exhibit 2,** a January 2011 Mark Monitor report entitled "Traffic Report: Online Piracy and Counterfeiting."  Internet websites like those operated by Defendants are estimated to receive tens of millions of visits per year and generate over $135 billion in annual online sales. *See* **Exhibit 3,** a 2012 Mark Monitor article entitled "White Paper: Seven Best Practices for Fighting Counterfeit Sales Online." According to an Intellectual Property Rights (IPR) Seizures Statistics Report issued by the Department of Homeland Security, the manufacturer's suggested retail price (MSRP) of goods seized by the U.S. government in fiscal year 2020 was over $1.3 billion. *See* **Exhibit 4**, "Intellectual Property Rights: Fiscal Year 2020 Seizure Statistics" prepared by the U.S. Customs and Border Protection Office of Trade. E-commerce sales, including those through third-party platforms, resulted in a sharp increase in small packages into the U.S. annually. It is estimated that 260 million packages are shipped through the mail

and 89% of all intellectual property rights seizures take place in the international mail and express mail environments. Counterfeiters also ship products in small quantities via international mail to minimize detection by U.S. Customs and Border Protection ("CBP"). Over 90% of all CBP intellectual property seizures were smaller international mail and express shipments (as opposed to large shipping containers). *See* **Exhibit 5,** "Intellectual Property Rights: Fiscal Year 2017 Seizure Statistics" prepared by the U.S. Customs and Border Protection Office of Trade.

25.     E-commerce store operators like Defendants are also estimated to contribute to tens of thousands of lost jobs for legitimate businesses and broader economic damages such as lost tax revenue every year. *See* **Exhibit 6**, a Frontier Economics report prepared for BASCAP (Business Action to Stop Counterfeiting and Piracy) and INTA (The International Trademark Association) entitled "The Economic Impacts of Counterfeiting and Piracy." Per the report, the estimated value of international and domestic trade in counterfeit and pirated goods in 2013 was $1.13 trillion and was projected to be between $1.90 and $2.81 trillion by 2022, in addition to broader economic losses of more than $125 billion every year. The report indicated that global employment losses due to counterfeit goods were between 2 million and 2.6 million jobs in 2013, with job displacement expected to double by 2022.

26.     Defendants have targeted sales to Illinois residents by setting up and operating e-commerce stores that target United States consumers using one or more Seller Aliases, offer shipping to the United States, including Illinois, accept payment in U.S. dollars and, on information and belief, sell Unauthorized Products to residents of Illinois.

27.     Defendants concurrently employ and benefit from similar advertising and marketing strategies. For example, Defendants facilitate sales by designing the e-commerce stores operating under the Seller Aliases so that they appear to unknowing consumers to be authorized retailers, outlet stores, or wholesalers selling genuine products. The e-commerce stores operating under the Seller Aliases appear sophisticated and accept payment in U.S. dollars in multiple ways, including via credit cards,

Alipay, Amazon Pay, and/or PayPal. The e-commerce stores operating under the Seller Aliases also often include content, images and design elements that make it very difficult for consumers to distinguish such counterfeit sites from an authorized website. Some e-commerce store operators like Defendants further perpetuate the illusion of legitimacy by offering "live 24/7" customer service and using indicia of authenticity and security that consumers have come to associate with authorized retailers, including the McAfee® Security, VeriSign®, Visa®, MasterCard®, and PayPal® logos. Plaintiff has not licensed nor authorized Defendants to use Plaintiff's Trademarks and none of the Defendants are authorized retailers of Genuine Gillette Products.

28.     Many Defendants also deceive unknowing consumers by using Plaintiff's Trademarks without authorization within the content, text, and/or meta tags of websites in order to attract various search engines looking for websites relevant to consumer searches for Genuine Gillette Products. Additionally, e-commerce store operators like Defendants use other unauthorized search engine optimization (SEO) tactics and social media spamming so Unauthorized Product listings show up at or near the top of relevant search results and misdirect consumers searching for Genuine Gillette Products. Defendants only show Plaintiff's Trademarks in product images while using strategic item titles and descriptions that will trigger their listings when consumers are searching for Genuine Gillette Products. Further, Defendants utilize similar illegitimate SEO tactics to propel new domain names to the top of search results after others are shut down.

29.     E-commerce store operators like Defendants commonly engage in fraudulent conduct when registering the Seller Aliases by providing false, misleading and/or incomplete information to e-commerce platforms to prevent discovery of their true identities and the scope of their e-commerce operations.

30.     Defendants go to great lengths to conceal their identities and often use multiple fictitious names and addresses to register and operate their Seller Aliases. For example, many of

24

Defendants' names and physical addresses used to register their Seller Aliases are incomplete, contain randomly typed letters, or fail to include cities or states. Other Defendants use privacy services that conceal the owners' identity and contact information. Upon information and belief, some of the tactics used by the Defendants to conceal their identities and the scope and interworking of their counterfeit operations to avoid being shut down include regularly creating new websites and online marketplace accounts on various platforms using the identities listed in Schedule A to the Complaint, as well as other fictitious names and addresses. Such registration patterns are sophisticated and regularly confuse consumers residing in the Judicial District.

31.     In addition to operating under multiple fictitious names, e-commerce store operators like Defendants use a variety of other common tactics to evade enforcement efforts. For example, when counterfeiters like Defendants receive notice of a lawsuit they will often register new domain names or online marketplace accounts under new aliases and move website hosting to rogue servers located outside the United States once notice of a lawsuit is received. Rogue servers are notorious for ignoring take down demands sent by brand owners. Counterfeiters will also ship products in small quantities via international mail to minimize detection by U.S. Customs and Border Protection ("CBP"). Over 90% of all CBP intellectual property seizures were smaller international mail and express shipments (as opposed to large shipping containers). A 2020 CBP media release on seizures of illicit goods from China reports "the explosive growth of e-commerce has generated a substantial increase in international mail and express consignment shipments. Foreign sellers are exploiting this trend to ship counterfeit and other illicit goods into the United States and to commit other trade violations." *See* **Exhibit 7**, a September 2020 U.S. Customs and Border Protection Press Release regarding Operation Mega Flex. Notably, CBP processes more than 420,000 parcels of mail and 180,000 express consignment shipments from China on average each day and has found that approximately 12.5% of targeted parcels contain counterfeit goods or contraband.

32.     Third party service providers like those used by Defendants do not adequately subject new sellers to verification and confirmation of their identities, allowing counterfeiters to "routinely use false or inaccurate names and addresses when registering with these e-commerce platforms." *See* **Exhibit 8**, Daniel C.K. Chow, *Alibaba, Amazon, and Counterfeiting in the Age of the Internet*, 40 NW. J. INT'L L. & BUS. 157, 186 (2020); *See also*, a report on "Combating Trafficking in Counterfeit and Pirated Goods" prepared by the U.S. Department of Homeland Security's Office of Strategy, Policy, and Plans (Jan. 24, 2020) attached as **Exhibit 9**, which found that on "at least some e-commerce platforms, little identifying information is necessary for a counterfeiter to begin selling" and recommending that "significantly enhanced vetting of third-party sellers" is necessary. Counterfeiters hedge against the risk of being caught and having their websites taken down from an e-commerce platform by preemptively establishing multiple virtual store-fronts. *See* **Exhibit 9** at p. 22. Since platforms generally do not require a seller on a third-party marketplace to identify the underlying business entity, counterfeiters can have many different profiles that can appear unrelated even though they are commonly owned and operated. *See* **Exhibit 9** at p. 39. Further, "E-commerce platforms create bureaucratic or technical hurdles in helping brand owners to locate or identify sources of counterfeits and counterfeiters." *See* **Exhibit 8** at 186-187.

33.     In the summer of 2019, the USPTO partnered with the Federal Research Division within the Library of Congress for research and analytical support examining various aspects of domestic and international counterfeit trade, including the overall magnitude of the markets, the impacts on the U.S. economy, the role of the private sector in limiting exploitations, trends in trade via small parcels, risks to public health and safety, consumer attitudes toward such products, and the use of social media to facilitate the sale of counterfeit goods. The resulting February 2020 report entitled *U.S. Intellectual Property and Counterfeit Goods – Landscape Review of Existing/Emerging Research* found that as of 2018, counterfeiting is the largest criminal enterprise in the world, with domestic and

international sales of counterfeit and pirated goods totaling between an estimated $1.7 trillion and $4.5 trillion a year—a higher amount than either drugs or human trafficking. Around 80 percent of these goods are produced in China, and 60 percent to 80 percent of those products are purchased by Americans. Both statistics provide a general sense of the significant impacts such illicit trade has on the U.S. economy, U.S. business interests, and U.S. innovations. *See* **Exhibit 10,** a report entitled "U.S. Intellectual Property and Counterfeit Goods – Landscape Review of Existing/Emerging Research" prepared by the Federal Research Division of the Library of Congress under an interagency agreement with the USPTO, U.S. Department of Commerce.

34.     The 2021 Review of Notorious Markets for Counterfeiting and Piracy, prepared by the Office of the United States Trade Representative, an Executive Office of the President, reports that commercial-scale copyright piracy and trademark counterfeiting cause significant financial losses for U.S. right holders and legitimate businesses, undermine critical U.S. comparative advantages in innovation and creativity to the detriment of American workers, and pose significant risks to consumer health and safety. Counterfeit product manufacturing occurs in illicit operations that by nature do not operate within the wide range of regulations, licensing requirements, government oversight, and government inspections that not only ensure products are safe for consumers, but also ensure that the rights of workers are protected. The informal economy in which counterfeiting thrives makes the occurrence of labor abuses, including forced labor and child labor, in counterfeit production sites difficult to detect and report. China is the top country of origin for counterfeit goods seized by U.S. Customs and Border protection as well as the country with the greatest number of products made with forced labor, including state-sponsored forced labor. The Biden administration added WeChat's e-commerce ecosystem and AliExpress, an e-commerce site owned by Alibaba, to this Notorious Market list. A true and correct copy of this report is attached hereto as **Exhibit 11**.

35.         Further, counterfeiters such as Defendants typically operate multiple credit card

merchants and various seller accounts behind layers of payment gateways so that they can continue to operate despite Plaintiff's enforcement efforts. E-commerce store operators like Defendants maintain off-shore bank accounts and regularly move funds from their accounts to off-shore bank accounts outside the jurisdiction of this Court.

36.     Even though Defendants operate under multiple fictitious aliases, the e-commerce stores operating under the Seller Aliases often share unique identifiers, such as templates with common design elements that intentionally omit contact information or other information for identifying Defendants or other Seller Aliases they operate or use. E-commerce stores operating under the Seller Aliases include other common features, such as registration patterns, accepted payment methods, check-out methods, keywords, advertising tactics, similarities in price and quantities, the same incorrect grammar and misspellings, and/or the use of the same text and images. Additionally, Unauthorized Products for sale by the Seller Aliases bear similar irregularities and indicia of being counterfeit to one another, suggesting that the Unauthorized Products were manufactured by and come from a common source and that Defendants are interrelated.

37.     E-commerce store operators like Defendants communicate with each other through QQ.com chat rooms and utilize websites, like sellerdefense.cn, that provide tactics for operating multiple online marketplace accounts and evading detection by brand owners. Websites like sellerdefense.cn also tip off e-commerce store operators, like Defendants, of new intellectual property infringement lawsuits filed by brand owners, such as Plaintiff, and recommend that e-commerce operators cease their infringing activity, liquidate their associated financial accounts, and change the payment processors that they currently use to accept payments in their online stores.

38.     Defendants are working to knowingly and willfully manufacture, import, distribute, offer for sale, and sell Unauthorized Products in the same transaction, occurrence, or series of transactions or occurrences. Defendants, without any authorization or license from Plaintiff, have

knowingly and willfully used and continue to use Plaintiff's Trademarks in connection with the advertisement, distribution, offering for sale, and sale of Unauthorized Products into the United States and Illinois over the Internet.

39.    Defendants' unauthorized use of Plaintiff's Trademarks in connection with the advertising, distribution, offering for sale, and sale of Unauthorized Products, including the sale of Unauthorized Products into the United States, including Illinois, is likely to cause and has caused confusion, mistake, and deception by and among consumers and is irreparably harming Plaintiff.

## COUNT I
## TRADEMARK INFRINGEMENT AND COUNTERFEITING (15 U.S.C. § 1114)

40.    Plaintiff repeats, re-alleges, and incorporates by reference herein the allegations contained in the preceding paragraphs of this Complaint.

41.    This is a trademark infringement action against Defendants based on their unauthorized use in commerce of counterfeit imitations of Plaintiff's Trademarks in connection with the sale, offering for sale, distribution, and/or advertising of infringing goods. Plaintiff's Trademarks are highly distinctive marks. Consumers have come to expect the highest quality from Genuine Gillette Products offered, sold, marketed or provided under Plaintiff's Trademarks.

42.    Defendants have sold, offered to sell, marketed, distributed, and advertised, and are still selling, offering to sell, marketing, distributing, and advertising products using counterfeit reproductions of Plaintiff's Trademarks without Plaintiff's permission.

43.    Plaintiff is the exclusive registered owner of Plaintiff's Trademarks. *See* **Exhibit 1**. The United States Registrations for Plaintiff's Trademarks are in full force and effect. Upon information and belief, Defendants have knowledge of Plaintiff's rights in Plaintiff's Trademarks and are willfully infringing and intentionally using Plaintiff's Trademarks on Unauthorized Products. Defendants' willful, intentional, and unauthorized use of Plaintiff's Trademarks is likely to cause and is causing confusion, mistake, and deception as to the origin and quality of the Unauthorized Products

among the general public.

44.     Defendants' activities constitute willful trademark infringement and counterfeiting under 15 U.S.C. §§ 1114.

45.     The injuries and damages sustained by Plaintiff have been directly and proximately caused by Defendants' wrongful reproduction, use, advertisement, promotion, offering to sell, and sale of Unauthorized Products.

46.     Plaintiff has no adequate remedy at law, and, if Defendants' actions are not enjoined, Plaintiff will continue to suffer irreparable harm to its reputation and the goodwill of Plaintiff's Trademarks.

## COUNT II
## FALSE DESIGNATION OF ORIGIN (15 U.S.C. § 1125(a))

47.     Plaintiff repeats, re-alleges, and incorporates by reference herein the allegations contained in the preceding paragraphs of this Complaint.

48.     Defendants' promotion, marketing, offering for sale, and sale of Unauthorized Products has created and is creating a likelihood of confusion, mistake, and deception among the general public as to the affiliation, connection, or association with Plaintiff or the origin, sponsorship, or approval of Defendants' Unauthorized Products by Plaintiff.

49.     By using Plaintiff's Trademarks in connection with the sale of Unauthorized Products, Defendants create a false designation of origin and a misleading representation of fact as to the origin and sponsorship of the Unauthorized Products.

50.      Defendants' false designation of origin and misrepresentation of fact as to the origin and/or sponsorship of the Unauthorized Products to the general public involves the use of counterfeit marks and is a willful violation of Section 43 of the Lanham Act, 15 U.S.C. § 1125.

51.     Plaintiff has no adequate remedy at law and if Defendants' actions are not enjoined, Plaintiff will continue to suffer irreparable harm to its reputation and the goodwill of its Gillette brand,

Genuine Gillette Products and Plaintiff's Trademarks.

## COUNT III
## VIOLATION OF ILLINOIS UNIFORM DECEPTIVE TRADE PRACTICES ACT
### (815 ILCS § 510/1, *et seq.*)

52. Plaintiff repeats, re-alleges, and incorporates by reference herein the allegations contained in the preceding paragraphs of this Complaint.

53. Defendants have engaged in acts violating Illinois law including, but not limited to, passing off their Unauthorized Products as those of Plaintiff, causing likelihood of confusion and/or misunderstanding as to the source of their goods, causing a likelihood of confusion and/or misunderstanding as to an affiliation, connection, or association with Genuine Gillette Products, representing that their Unauthorized Products have Plaintiff's approval when they do not, and engaging in other conduct which creates likelihood of confusion or misunderstanding among the public.

54. The foregoing Defendants' acts constitute a willful violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS § 510/1 *et seq.*

55. Plaintiff has no adequate remedy at law, and Defendants' conduct has caused Plaintiff to suffer damage to its reputation and goodwill. Unless enjoined by the Court, Plaintiff will suffer future irreparable harm as a direct result of Defendants' unlawful activities.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against each of the Defendants as follows:

1) That Defendants, their affiliates, officers, agents, servants, employees, attorneys, confederates, and all persons acting for, with, by, through, under, or in active concert with them be temporarily, preliminarily, and permanently enjoined and restrained from:

    a. using Plaintiff's Trademarks or any reproductions, counterfeit copies, or colorable imitations thereof in any manner in connection with the distribution, marketing, advertising, offering for sale, or sale of any product that is not a Genuine Gillette

Product or is not authorized by Plaintiff to be sold in connection with Plaintiff's Trademarks;

b.      passing off, inducing, or enabling others to sell or pass off any product as a Genuine Gillette Product or any other product produced by Plaintiff that is not Plaintiff's or is not produced under the authorization, control, or supervision of Plaintiff and approved by Plaintiff for sale under Plaintiff's Trademarks;

c.      committing any acts calculated to cause consumers to believe that Defendants' Unauthorized Products are those sold under the authorization, control, or supervision of Plaintiff, or are sponsored by, approved by, or otherwise connected with Plaintiff;

d.      further infringing Plaintiff's Trademarks and damaging Plaintiff's reputation and goodwill; and

e.      manufacturing, shipping, delivering, holding for sale, transferring or otherwise moving, storing, distributing, returning, or otherwise disposing of, in any manner, products or inventory not manufactured by or for Plaintiff, nor authorized by Plaintiff to be sold or offered for sale, and which bear any of Plaintiff's Trademarks;

2)      Entry of an Order that, upon Plaintiff's request, those with notice of the injunction, including without limitation, any websites and/or online marketplace platforms, including Alibaba, AliExpress, Amazon, DHGate, eBay, Fruugo, Wish, and Walmart, shall disable and cease displaying any advertisements used by or associated with Defendants in connection with the sale of counterfeit and infringing goods using Plaintiff's Trademarks;

3)      That Defendants account for and pay to Plaintiff all profits realized by Defendants by reason of Defendants' unlawful acts herein alleged, and that the amount of damages for infringement of Plaintiff's Trademarks are increased by a sum not exceeding three times the amount thereof as provided by 15 U.S.C. § 1117;

4)      In the alternative, t h a t Plaintiff be awarded statutory damages for willful trademark counterfeiting pursuant to 15 U.S.C. § 1117(c)(2) of $2,000,000 for each and every use of Plaintiff's Trademarks;

5)      That Plaintiff be awarded its attorneys' fees and full costs for bringing this action pursuant to 17 U.S.C. § 1117(a); and

6)      Award any and all other relief that this Court deems just and proper.

Dated this 12th day of May 2025.          Respectfully submitted,

                                          /s/ Martin F. Trainor
                                          Martin F. Trainor
                                          Sydney Fenton
                                          Alexander Whang
                                          TME Law, P.C.
                                          10 S. Riverside Plaza
                                          Suite 875
                                          Chicago, Illinois 60606
                                          708.475.1127
                                          martin@tme-law.com
                                          sydney@tme-law.com
                                          alexander@tme-law.com

                                          *Attorneys for Plaintiff The Gillette Company LLC*